DuPage County State's Attorney's Office at all. On behalf of the Appellant, Mr. Michael Rieses, on behalf of the Appellee, Mr. Jeffrey Gifford. Thank you. Before we start, Justice Shostak has a personal matter that came up rather recently, and I will listen to the oral argument that is placed on the website of the Illinois Supreme Court. So she will, in fact, participate in the rendition of the disposition. Mr. Rieses, would you step forward, please? Thank you. Good morning, and may it please the Court, Counsel. My name is Mike Rieses, and I'm here today on behalf of Appellant State Farm Fire and Chaos Street Company. We appeal for an order that granted the County Section 2615 motion for judgment on counts 3 and 4 of the Second Amendment complaint. We respectfully submit that the trial court erred in granting judgment to the County when principles of horizontal exhaustion required the County to pay a settlement that was within the retained limit of its insurance program. Principles of horizontal exhaustion applied regardless of whether the County had insurance or was partially self-insured for the loss. The County's refusal to protect its employee caused State Farm to pay under its secondarily liable personal liability umbrella policy. Unless there is one rule that applies to partially self-insured entities, the judgment below cannot stand. State Farm was entitled to subrogation and reimbursement. To recover under equitable subrogation, one, the defendant must be primarily liable. Two, the plaintiff must be secondarily liable. Three, the plaintiff must have discharged its liability and at the same time extinguished the defendant's liability to the employee. Each of these conditions was met. First... Mr. Rezus, you say that the plaintiff, meaning your client... State Farm, yes. ...was secondarily liable. Why do you say secondarily? We issued a policy of personal liability excess or umbrella coverage, which applied only in excess of certain underlying insurance, which had to cover regularly vehicles that were regularly furnished to Ms. Rodastus. We did not pay $1. We only paid above underlying insurance that should have applied... But there was no underlying insurance. Well, the issue here is whether the County's insurance program qualifies as underlying insurance, just as it would be if you take the Missouri-Pacific case from this district, where the court said that self-insured retentions are the functional equivalent of underlying insurance. If the County was a railroad, we wouldn't be here, I suspect, because it would not be disputed that the County would be paying $1 up to its attachment point of $2 million if the settlement could not be reached within its limit. But isn't there a very specific difference between the County and the railroad, other than the fact that they have different names, that the County is a public entity, the railroad is not? But in either case, the County went out into the marketplace and used taxpayer dollars to pay premium, to pay the premium for insurance coverage that attached above a certain predetermined attachment point. And that's true. They are not, the County is not like, say, Irma, which I know the Court is familiar with from Bennis and from Yesenio, and the Supreme Court case of Antiporac, because there you have a completely internalized joint risk management of pooled public funds. No money is being spent on insurance premiums. They're not going to the marketplace. They're not sharing the risk of loss with for-profit insurance companies. Here, the County is making a decision, like any other entity, to retain some of the risk and laying off the rest of that risk with commercial insurance. That is the key difference. And there is no case, and we would acknowledge there is no case, that has addressed this precise situation. Bennis, which Justice McLaren authored, and Yesenio are cases involving the County, and the County is not a participant in Irma. If we can agree on nothing else, we should be able to agree that the County is not a participant in Irma. Illinois courts, the Supreme Court in Kojima, we had a program called My Friend Irma a long, long time ago. I remember that. I think I heard something about it, but I can't quite say whether it was a radio show, and then I think it was on TV in the 50s, and a blonde actress who played a blonde, because I remember her. She reminded me of Mary Hartline, if you remember Super Circus. Be that as it may, the name Irma reminded me of my childhood days. I'm sorry for the time. It happens to me all the time. I start to spontaneously associate from cases to my childhood, I guess. Mr. Reese, let me ask a question about the County is self-insured to, was it 2 million? Yes. And then their second policy, or whatever they call it, would kick in after that? I think the attention point is 2, and it goes up to 10. Why is it different than the theory of Irma if the 2 million is public money, would be public money, and the money spent on the secondary policy would also be public money? Why wouldn't there be that same theory that they are who they insure, therefore they are one and the same? Right, tax dollars and tax dollars in either situation. And I think the way to answer that is to first look at what the risk sharing arrangement is. And starting with Auntie Porrick, what the Supreme Court has emphasized is that in Irma, or the Intergovernmental Risk Management Agency, is a risk transfer mechanism where every dollar goes to pay claims. Every dollar, without exception. And they call it a completely internalized mechanism. But for partially self-insured entities, like the county, they're going into the marketplace, and they're not spending every taxpayer dollar on the payment of claims. They are making a decision like any other entity, any other organization, that they will retain some of the risk, which is what you're referring to for the first 2 million, the retained limit. And they're sharing the risk with the for-profit insurance companies. And that is a far cry from what the cases have addressed under Irma. But according to, I thought, their procedure, the money spent in this case would first have to come from the 2 million limit before it jumped into this, you know, rather, the shared risk issue. And so aren't we still talking about the same problems that we have with the Irma case? But I don't think it is exactly the same problem, because the fortuity is that in this case it was somewhere within the 2 million. Correct. In another case, it might require an expenditure of funds above the 2 million, and part of it would come from the county, and part of it would come from for-profit insurance companies. And depending upon the size of the loss, it might involve one of their companies, it might involve State Farm, it might involve all three companies. But the point is that before you get a loss, you have to have the risk transfer mechanism. Say it again, please. Before you have a loss, you have to have a risk transfer mechanism, whether it's Irma or private insurance or some combination of, you know, partial self-insurance and insurance. And you cannot analogize the situation where they go out and buy policies, which may or may not apply, like any other organization, and a completely closed, internalized pool of public funds. They operate differently. And the courts have recognized they operate differently. And what they really want to do is they want to extend the holding of and the first case in the Supreme Court, anti-POREC, beyond the holdings of those cases and the stated rationale of those cases to protect them from their own decision to go into the marketplace like anybody else and buy insurance that attaches above a predetermined point or retained limit that they thought was affordable. You're saying basically that those prior cases are not precedential? I don't believe they apply here. They are precedent, but they don't apply here and control here. Okay. And we're not questioning those cases. Well, neither am I. Is there any case that you think is precedential? Well, I'll tell you what I think is a good case for us. I'm not going to say it can't be because it's persuasive. I would say I would consider it precedential. The CHIRP case, the Chicago Risk Management case, and what I think is precedential about that case is that although it does not involve a governmental entity, which is a point that was discussed in Yesenia, the significance of that case is that it clearly states that self-insurance is considered insurance if the insured is partially insured. Okay? So that applies to this situation. The true self-insured, the pure self-insured is the arm of a situation where they have completely internalized the risk and they're not sharing it with anybody other than other municipalities. And every taxpayer dollar goes to pay claims. We believe that the CHIRP case, is, and we have quoted the relevant language in our reply brief. Hold on one second. I think it's important enough to cite page four of the reply brief. When an entity chooses to completely retain the risk of a particular loss rather than obtain a traditional insurance policy, self-insurance is not insurance. That's true. And that's also IRMA. But that's not this case. This case involves only a partially self-insured and in CHIRP the court went on to say that a insurance company and pursue a claim. Not only was the county primarily liable, but State Farm was only secondarily liable for the loss. State Farm's umbrella policy was a unique and special coverage above primary insurance or self-insurance in this situation where the county does have a certain predetermined attachment point. Our policy sat above three car policies in the Rodastus household. Rodastus had to maintain the underlying car insurance. That's condition four of the policy, including insurance on vehicles regularly furnished to Rodastus at all times. But it's not disputed that the car policies did not cover the county vehicle involved in the accident. Instead, the county's $2 million self-insurance is the underlying insurance for a county vehicle that was regularly furnished to Rodastus in her employment, and that self-insurance pays first. The State Farm umbrella policy was excess over valid and collectible insurance, and we know from Missouri Pacific that self-insurance qualifies as insurance under another insurance clause. That's condition five of our policy, and our policy did not drop down to pay $1 when it is that unique and special coverage. The trial court's decision violates conditions four and five and is in disregard of the special nature of the umbrella policy. Third and finally, the county was liable for the settlement when it did not rebut the presumption that its employee was driving the county vehicle in the scope of her county employment. She was required to be on call 24 hours a day to respond to telephone calls involving criminal activities. She was given a car and a cell phone by the county for that very reason. The pleadings alleged that she had been on the cell phone making employment-related calls, including one to her supervisor shortly before the accident. It is undisputed that she was driving her employer's vehicle within scope of her employment at the time of the accident. The county's payment did not eliminate her liability. They paid $100,000 for their own liability. State Farm was forced to pay $400,000 to protect its insured and to secure a release after the county refused to defend and identify her despite the respondeant's superior allegations on file and the county's payment created an additional presumption that the underlying plaintiff would have prevailed on her theory at trial under Home Insurance v. Cincinnati. Mindful that oral argument is a privilege and not a right. We are grateful for the opportunity to address the court this morning and to discuss this important case with you. We ask you to reverse. Thank you. You'll have a chance. Thank you. Mr. Given. Was it a black jaguar or a black panther? That was not mine, Your Honor. I have the Dodge minivan in the public garage. May it please the court, counsel. Good morning. It's my honor to appear in front of you today and I represent the District Attorney's Office. I'm here to discuss the public policy in this case. What I'd like to do is focus on the public policy that was discussed by the Supreme Court in the Annapurna case, and that was also discussed at some length by this court and Justice McLaren in the Aetna case. And I don't know if I should refer to it as Aetna or Venice. Nonetheless, if I say Aetna, I'm talking about the same case that Mr. Reese's is. But very quickly and before I do that, excuse me, I want to address three things very quickly that Mr. Reese's race. First, he said that when you ask him if there was any case that that was precedential in his favor, at least persuasive, he mentioned the CHRPP case. And I would like to point out in our brief at page 13 that the Uchino case of this court actually distinguished the CHRPP case because, and it noted, quote, the public policy considerations discussed in Annapurna and Aetna were not present because, and this is the quote, hospitals, although not profit institutions, were not public entities, and therefore, there was no risk that public funds would be expended to pay claims. So if he's relying on CHRPP, it doesn't help him at all. Secondly, I do want to address Well, it might help him a little bit. It might help him a little bit. But ultimately, the holding in that case was that, in fact, there was an almost identical other insurance clause that, just like the one in this PWP, that said it was excess only if there was other valid and collectible insurance. CHRPP actually held that, and Mr. Reese's doesn't dispute, that a self-insured self-insurance in that instance is not valid and collectible insurance, and it cites another case, the USX case as well. So, honestly, it might help him a little bit. It's a very confusing case, CHRPP, that is. But I don't think it really helps him very much at all. Secondly, before I get to the public policy discussion, I do want to briefly address State Farm's argument that the county's excess insurance policies somehow obviates the holdings of Annapurna and Aetna and Uchino. It absolutely does not. And first of all, I would point out that State Farm even admits in his reply brief that it waived this argument. It never made this argument below. But even if this Court chooses to treat the issue, which it can, it doesn't really help State Farm at all. And that's because, for two basic reasons. First, as a factual matter, the excess insurance policy never played a role in this case. As Your Honor pointed out, the it kicks in at $2 million. And prior, and under $2 million, the county is a self-insured municipality, pure and simple. And in this case, the demand never exceeded $750,000. That was Ms. Lubinsky's original demand. It's the demand that State Farm said to the county, oh, by the way, pay us $750,000 so we can settle this case. And the county said no. And I'll get into that in just a minute. So at no time was excess insurance ever implicated in this case. And furthermore, what Mr. Resus fails to note, and frankly, I found it again last night as I was rereading the Aetna case, not only does State Farm not cite any cases for its position, but in fact, Aetna stands firmly against it. And Justice McClaren noted in the Aetna case that Irma was not an insurer, even though its agreement allowed Irma and its members to purchase excess insurance. And that is in the description of the Aetna agreement at 229 Gillap 3rd at 419. Do you agree with Mr. Resus's comment that his client is secondarily liable? I absolutely do not agree with that. I believe under the terms of the PLUP, they were primarily liable. That is discussed in our brief at some length for the reasons why. But essentially, and throughout their brief, they keep talking about how the PLUP is a quote-unquote true excess policy. Well, they don't define what they mean by true excess. And the cases that you read don't really define that there's one set thing called a true excess policy. But in fact, the PLUP is an umbrella policy. And the courts have held that it's a set of hybrid policies that contain some elements of primary, some elements of excess, and it kind of depends on the facts of the case and the facts of the claim as to which one it is. And in this case, it is clear that the PLUP, well, I shouldn't say it's clear because very little is clear in this case, but with regard to the PLUP and reading that policy. But I believe it is clear that under the facts of this case, the PLUP is in fact, that State Farm is a primary insurer under the PLUP. And that's one of the reasons why they don't meet the home insurance elements. That's the second element of home insurance. But so with regard to excess, in fact, this court noted in the Edna case that the fact that people, that self-insured municipalities or Irma can go out and buy excess insurance does not remove them from the policy considerations of Annapurna. And I do also want to briefly, I really want to get to those public policy arguments, but I do want to say in our brief, pretty much addresses this, but I can't let it go unmentioned where Mr. Reese's actually suggests that the county never rebutted some presumption that he says exists, that Ms. Rattlesnake's was at the time within the scope of her employment. In fact, the county has denied any allegations of scope of employment from the beginning of the underlying case through today. And in fact, when you look at the allegations contained in the pleadings alone, which of course, that's all we have at this point, you can read those pleadings in conjunction with the county's denial. And in fact, the case law that's out there, including the case that they cite, the Gia Noble case, would tell you that it's possible you could even do as a matter of law that she was outside the scope of her employment. She was on a drunken personal frolic. It's a very tragic case. I don't mean to, I certainly don't mean to make light of any of this, but it was a personal frolic that was outside the scope of her employment based solely on the  pleadings alone, which of course the judge ruled on in denying the state farms motion for the pleadings, it held that there was a question of fact that precluded granting their motion. And then he went on to rule as a matter of law in granting our motion. So those presumption that she was outside the scope of her employment is a very, very important issue in this case. And the public policy that was identified in Annapurna in which Justice McClaren discussed at some length in the case boils down to the fact that self-insured municipalities are not insurers because they protect governmental funds, which should not be risked to pay insurance claims. And I'm tempted to read into the record a little bit more about that. I won't, but I will address or point your attention to Justice McClaren's articulation of the policy at the 229 Bill Ave. 3rd at 421. And in fact, what Justice McClaren, what you did in that case was you picked up on Annapurna and you contrasted self-insured municipalities with companies like State Farm who are for-profit private companies who are paid to take insurance risks. Now, the public policy is dramatically illustrated in this case. Here, you have public officials like the state's attorney who were elected to decide how best to expend public funds. They believed that the county had strong defenses to the Lubinsky lawsuit, and they rejected State Farm's demand of $750,000 to pay Lubinsky. I absolutely agree. We rejected that out of hand. At that point, the county and State Farm then made their own separate business decisions, and they entered separate and independent settlements with Ms. Lubinsky. State Farm decided that they valued the claims against the estate at $400,000. One month later, in an entirely separate agreement, the county agreed to pay $100,000 with the specific and explicit rationale that it wanted to avoid additional litigation costs and the uncertainties of litigation. Now, even later, State Farm agreed to dismiss the estate's third-party claim. They, at one point, had brought a third-party claim seeking indemnification against the county, and they dismissed that with prejudice. Now, State Farm really has no legal or equitable standing to determine how much public money should be spent on the Lubinsky case. Generally, this court knows that an employee cannot unilaterally settle a lawsuit and then bind his employer to the amount of money that the employee decides to settle for. And that's especially true here, where the employer is a self-insured public entity, and the employee was acting outside the scope of her employment. And frankly, there are other statutory reasons why she did not meet indemnification under the county's ordinance. That's not part of the record. But suffice it to say that there are a number of defenses why the county does not and would not indemnify the employee. Now, if State Farm's position was accepted, it would have the very effect that Anacora and Aetna specifically guarded against. It would allow a private for-profit insurance company to be unjustly enriched by settling a claim and then having the municipality pay public funds that it didn't even agree to. And again, I would... Isn't there, though, in this case, a third entity that, I don't know the name of it, this additional policy? Well, it's that excess, but they're not in this case. There is, and there is no dispute that the county did purchase an excess insurance policy to cover extreme cases where above the amount that the county could afford its own self-insurance, they bought excess insurance. That policy played no role in this case because it never came close to $2 million. And in fact, I'll get to this in just a second, but State Farm, in their brief, in their reply brief, talks about, oh, the unjust enrichment that this commercial excess policy carrier would have in this case. And I'm baffled by that because there is no unjust enrichment to an excess insurance carrier has nothing to do with this claim. It might be a very interesting case if we had, we were in front of you with something that went above $2 million, but we don't. Well, the point is, you have the, you being the county of DuPage, have the contract with the excess insurer, but State Farm doesn't. Why couldn't State Farm attempt to bring them in, even though... I mean, if their theory is, you've used those funds, you've gone to a for-profit entity, why isn't that, why can't that for-profit entity be involved in this case? Well, I can't speak on behalf of State Farm. I don't know why. I'll ask in a minute. And in fact, I think there are a couple things that State Farm could have done in this case that they didn't do that also weighs against them on equitable grounds, which I'll get to in just a second. But I don't know why they didn't try to involve the excess insurer if, in fact, they thought it was somehow involved in the case. I suspect they didn't, because they know, they knew at the time, and they haven't come up with this excess insurance argument until the case got up on appeal, but I suspect it's because the lawyers at the ground level understood that the excess insurer wasn't involved in this. They couldn't make a claim on the excess insurer, because the case, the claim they knew had a maximum value of $750,000 in theory, and obviously it settled for less than that. So I suspect that's why they didn't do it, but I don't know. And in fact, let me go very briefly to the fact that State Farm, they say in their brief there are no rules governing this case. This is all about equity. Now, they want to ignore the home insurance case, because it actually has very specific rules that they don't meet. But even if this court wanted to address this case solely on the basis of equity and the State Farm side of the case, they wouldn't be able to do that, because the State Farm side of the case is a case called First American, which talks about equitable subrogation pre-home insurance. In fact, both you, Justice McLaren, wrote the case, and Justice Hutchinson, you concurred in that. And it talked about equitable subrogation in a mortgage situation, very inapposite here, but talked about equitable principles. And of course, as you noted, an element of equity is to place ultimate risk and to prevent injustice and unjust enrichment. Here, the equities strongly disfavor State Farm. It's a for-profit company. It accepts premiums to assume the very risks that occurred here. It would also be unjustly enriched by agreeing to pay $400,000 and then saying, oh, by the way, no, we don't really have to pay $400,000. So if they believed that the PLUP did not cover the estate, or if they believed, as they talk about in their brief, that Ms. Rathastitz breached the agreement because she didn't tell them about the county car or some other breach, then they could have sought repayment from the estate. They had a reservation of rights against the estate, and they could have paid it out. I'm not talking about the present appellant. Are you talking about the primary insurer? I'm talking about State Farm. And under the PLUP, I'm a little confused as to which State Farm I'm talking about. But I believe it will be ultimately the appellant who had the PLUP. Well, I think State Farm Fire and Casualty is the umbrella policy, and State Farm Mutual Automobile is the automobile policy. And they were the ones that were declared to be a non-coverage situation. Under the three cot policies, right. As I said, I'm a little confused by the corporate identity issue, but some State Farm entity could have gone after the estate under their reservation of rights and said, we paid $400,000 to settle the claim, but by the way, you breached the PLUP, and consequently, you owe us the money back. They could have done that, but they didn't. And Justice Hutchinson, you asked why they didn't go after an excess insurance carrier. I question why they didn't go after the estate. Furthermore, they could have also pursued, in a true subrogation way, they could have decided, they being State Farm, whichever entity of State Farm it was, could have decided to step into the shoes of the estate and pursue the indemnification claim, that the third-party claim that the estate owner, the estate brought, saying, hey, by the way, you need to indemnify. But they didn't do that. They dismissed that claim with prejudice and left themselves solely with an equitable subrogation claim and reimbursement claim, which as we point out in our briefs, are basically the same anyway. Finally, I do want to point out that the equities favor the county for several reasons. Primarily, there's no unjust enrichment going on here for the county. And the reason I'm saying your brief is if it is, you don't have to tell us. I didn't talk about the equities that much, but you know what? It's all in there. And in fact, with that said, Your Honor, thank you. Do you have any questions? We would ask that the judgments be affirmed. Before you go, I did threaten to ask you the same question. If this for-profit excess insurer is the problem of the county's case, in your opinion, why didn't you go after that insurer too? State Farm couldn't sue them when the loss was within the county's retained limit under its insurance program. Then how can they be implicated now? We're not saying that the excess insurer is implicated. What we're saying is that the insurance program of the county is fundamentally different than the completely internalized risk management of Irma. And that the use of money to pay premiums in the insurance marketplace makes the county no longer the insurer. The county is no different from any other partially self-insured. Their self-insurance is a functional equivalent of insurance for purposes of horizontal exhaustion. But if the county felt that they could not pay up to $10 million and it would be a better use of their money to pay premiums to go to $10 million, how can that be different than the public policy issue under Irma? That they're trying to use the public funds in the best possible way. If I could read an answer to that question, I could read from the Bettis case, Justice McLaren's case, where he's quoting the Supreme Court decision in Antiporic. The Supreme Court said, Irma participants have not shifted the risk to for-profit risk takers, but have instead decided to share the risk among themselves. Funding underscores that the risks and costs of civil liability are completely internalized among its participants, so every penny paid on every claim is taken from revenue otherwise available to meet governmental responsibilities of members. Here, the county is not doing that. They are only partially self-insured. It's not that we have a cause of action against the excess insurance company. It's that they've made a decision like any other insured to go into the marketplace and to buy insurance above a predetermined attachment point. That makes their self-insurance no different than the railroad self-insurance in Missouri Pacific, for example. Going to the second point, state farms policy is a true excess policy. I'm amazed that counsel would stand here this morning and say, well, maybe we should have sued our own insured if the underlying insurance wasn't maintained. Doesn't that just prove that we had to be excess and that the underlying insurance had to be maintained? How can he have it both ways? He wants to say we're primary, then he says we should have sued our insured. That's his idea of equity. Referring to condition for the policy, our policy says you, meaning Rodascus, must maintain your underlying insurance. That insurance can come from any source. It states the limits listed in the declarations are the minimum you must maintain. The minimum limit was 100, but it could be any limit. Then it says if the required underlying limits are not maintained, you, meaning Rodascus, will be responsible for the underlying limit. That underscores that we're excess. We don't pay $1 for regularly furnished vehicles in any situation. And if he's saying that we should have sued our insured, he has to acknowledge that we were excess and not primary. And what was the underlying limit? The underlying limit listed in the policy was 100, but of course that doesn't mean that there couldn't be insurance that applied on a primary basis to the vehicle in excess of 100. Well, then, if that were the case, you would be entitled to $100,000 from the estate, which even if you were entitled to recover against the county, it would be reduced down from $400,000 down to $300,000? Well, they've not made that argument, number one. I didn't say they did. I'm just trying to follow the logic of your argument. Well, no, but the logic of the argument, excuse me, if, for example, I mean, that is just the minimum limit. The limits listed in the declaration are the minimum limits you maintain. It has to be no less than 100, but it could be more than 100. If she's driving a vehicle that has other insurance on it that's above 100, we come in above those limits even if they're above 100. What were the limits that she had with State Farm Automobile? The auto was 100. So she was maintaining certainly the minimum limit. Yes, correct, correct. A couple of other points just briefly. Counsel says that there were facts to rebut the presumption of agency. They didn't present any facts. She's driving a county vehicle. She's talking to her supervisor on the cell phone. It's tragic. A minute before the accident, and they stand up here and say it's a drunken frolic? They're talking about a criminal matter. She's driving their car. She's on their phone. They say it's a drunken frolic. They weren't prepared to take that case to a jury. Pretty easy to understand why that's the case. They're primarily liable, like any other partially self-insured. We're secondarily liable. We extinguish their liability. We're entitled to judgment. We ask you to reverse. Thank you.